**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**CHATTANOOGA DIVISION**

DANIA SANTOS TORRES
On behalf of Christopher Ayala as
his Next of Kin

*Plaintiff*

v.

HAMILTON COUNTY, TENNESSEE

AUSTIN GARRETT
Hamilton County Sheriff,

SHAUN SHEPHERD
Deputy Chief of Corrections,

JOHN HARGIS
HCSO Corrections Captain,

BYRON KNIGHT
HCSO Corrections Captain,

JEREMY POTEET
HCSO Corrections Sergeant,

BENJAMIN PERRY
HCSO Corrections Sergeant,

JASON STOLZ
HCSO Corrections Corporal,

DEPUTY CORY WIDDOWS
Hamilton County Sheriff's Office,

DEPUTY PITRE
Hamilton County Sheriff's Office,

JURY DEMAND

CASE NO: ________________

DEPUTY SANDOVAL )
Hamilton County Sheriff's Office, )
)
DEPUTY THURMAN )
Hamilton County Sheriff's Office, )
)
DEPUTY TERRY )
Hamilton County Sheriff's Office, )
)
HCSO JOHN DOES, )
)
QCHC OF TENNESSEE, PLLC., )
)
DR. JOHNNY E. BATES )
Owner, QCHC of Tennessee, PLLC, )
)
NURSE MARSH, )
)
QCHC JOHN DOES )
)
*Defendants* )

---

**COMPLAINT FOR DAMAGES WITH JURY DEMAND**

COMES NOW, Plaintiff, DANIA SANTOS TORRES, by and through undersigned counsel of record and as for her claims of action against the above-named Defendants, alleges and shows claim for relief as follows:

## I. PRELIMINARY STATEMENT

This is a civil rights action brought under the Fourteenth (or alternately Eighth) Amendment to the Constitution of the United States pursuant to Title 42, Section 1983 of the United States Code. Plaintiff brings this action to obtain compensatory damages, punitive damages, attorney's fees, costs, and other equitable relief arising from the Defendants' deliberate indifference to the serious emergency medical

needs of her son, Christopher Ayala, while in the custody and care of the Hamilton County Sheriff's Office. Despite numerous Defendants observing Christopher in obvious medical distress, and continually deteriorating, they failed to seek immediate, adequate medical attention in time to prevent resulting permanent brain damage which left Christopher both mentally and physically disabled.

## II. JURISDICTION AND VENUE

1. This action is brought pursuant to 42 U.S.C. § 1983. Jurisdiction is founded on 28 U.S.C. §§ 1331 and 1343.

2. This Court has supplemental jurisdiction to adjudicate state law claims, if any, which arise from the same facts and circumstances, pursuant to 28 U.S.C. § 1367(a).

3. Venue is properly laid before this Court pursuant to 28 U.S.C. § 1391(b)(2) because the acts occurred within Hamilton County, Tennessee, which lies within the U.S. Eastern District of Tennessee.

## III. PARTIES

4. Plaintiff, Dania Santos Torres ("MS. SANTOS"), is the natural mother and next of kin of Christopher Ayala ("CHRISTOPHER"), who was left with permanent brain damage because of medical neglect while in the custody of the Hamilton County Sheriff's Office. Ms. Santos holds power of attorney for Christopher and is a permanent resident of Hamilton County, Tennessee.

5. Defendant Hamilton County ("COUNTY") is a political subdivision created by the Tennessee General Assembly in 1819. It owns the Hamilton County

Jail ("JAIL") and is responsible for its' funding and operations. The County is also responsible for ensuring adequate funding is allocated to the Hamilton County Sheriff's Office ("HCSO") to keep its law enforcement and correctional officers properly trained and to ensure the Jail is compliant with federal and state law. The County is also responsible for ensuring adequate funding is allocated to Hamilton County Emergency Services ("EMS") to keep sufficient staff and equipment and to adequately train EMS staff to immediately respond to medical emergencies. Under T.C.A. § 41-4-115, the County's legislative body alone has the power, and it is their duty, to provide medical care to all inmates and detainees confined in the Jail.

6. Defendant Austin Garrett ("GARRETT") is the elected sheriff of Hamilton County and a resident of Tennessee. Garrett controls HCSO and the Jail. He is responsible for the hiring, training, and supervision of all employees under his command. As the final decision maker and policy maker, Garrett controls all Sheriff's Office employees and is responsible for all actions of his staff. Under T.C.A. § 41-4-101, Garrett has custody and charge of the Jail and of all prisoners committed to the Jail and may appoint a jailer, for whose acts the sheriff is civilly responsible. *Sowards v. Loudon County*, 203 F.3d 426, 436 (6th Cir. 2000). *See also United States v. Hill*, 60 F. 1005, 1009 (6th Cir. 1894) (... the Tennessee statute makes the sheriff civilly responsible for the acts of the jailer whom he appoints.) At all times relevant herein, Garrett was acting under color of state law and was responsible for Christopher's health, safety, and security. He is being sued in his official and individual capacities.

7. Defendant Shaun Shepherd ("SHEPHERD") is the Deputy Chief of Corrections for HCSO and a resident of Tennessee. Shepherd is responsible for overseeing all aspects of the Jail and its daily operations. Shepherd is responsible for the supervision and management of all Jail staff and inmates. Shepherd is duty-bound to receive and safely hold inmates; to ensure the security and welfare of all inmates; to determine what type of precautions to take for guarding against escape and contraband; to furnish adequate food and housing; to ensure proper maintenance and cleanliness of the Jail; and to ensure adequate and timely medical care. At all times relevant herein, Shepherd was acting under color of state law and was responsible for Christopher's health, safety, and security. He is being sued in his official and individual capacities.

8. Defendant John Hargis ("HARGIS") is the Captain over Corrections Security for HCSO and is a resident of Tennessee. Among his duties, Hargis is responsible for the daily operations of the Jail, the facility's physical security, the security and welfare of all staff and inmates, emergency plans, vulnerability assessments, threat group management, equipment upkeep, and video monitoring. Hargis is responsible for all movement of inmates within the Jail and when transported outside the Jail. At all times relevant herein, Hargis was acting under color of state law and was responsible for Christopher's health, safety, and security. He is being sued in his official and individual capacities.

9. Defendant Byron Knight ("KNIGHT") is the Captain over Corrections Night Shift Operations for HCSO and is a resident of Tennessee. Knight assists in

supervising Jail staff in guarding inmates and is responsible for all jail operations during night shift. At all times relevant herein, Knight was acting under color of state law and was responsible for Christopher's health, safety, and security. He is being sued in his official and individual capacities.

10. Defendant Jeremy Poteet ("POTEET") is a Corrections Sergeant for HCSO and is a resident of Tennessee. At all times relevant herein, Poteet was acting under color of state law and was responsible for Christopher's health, safety, and security. He is being sued in his individual capacity.

11. Defendant Benjamin Perry ("PERRY") is a Corrections Sergeant for HCSO and is a resident of Tennessee. At all times relevant herein, Perry was acting under color of state law and was responsible for Christopher's health, safety, and security. He is being sued in his individual capacity.

12. Defendant Jason Stolz ("STOLZ") is a Corrections Corporal for HCSO and a resident of Tennessee. At all times relevant herein, Stolz was acting under color of state law and was responsible for Christopher's health, safety, and security. He is being sued in his individual capacity.

13. Defendant Cory Widdows ("WIDDOWS)" is a HCSO Deputy and a resident of Tennessee. At all times relevant herein, Widdows was acting under color of state law and was responsible for Christopher's health, safety, and security. Upon information and belief, Widdows failed to recognize Christopher was in medical distress. Instead of seeking immediate medical attention, Widdows arrested

Christopher on a Class A Misdemeanor and took him to the Hamilton County Jail. He is being sued in his individual capacity.

14. Defendant Petri ("PETRI") is a HCSO Deputy and a resident of Tennessee. At all times relevant herein, Petri was acting under color of state law and was responsible for Christopher's health safety, and security. He is being sued in his individual capacity.

15. Defendant Sandoval ("SANDOVAL") is a HCSO Deputy and a resident of Tennessee. At all times relevant herein, Sandoval was acting under color of state law and was responsible for Christopher's health safety, and security. He is being sued in his individual capacity.

16. Defendant Thurman ("THURMAN") is a HCSO Deputy and a resident of Tennessee. At all times relevant herein, Thurman was acting under color of state law and was responsible for Christopher's health safety, and security. He is being sued in his individual capacity.

17. Defendant Terry ("TERRY") is a HCSO Deputy and a resident of Tennessee. At all times relevant herein, Terry was acting under color of state law and was responsible for Christopher's health safety, and security. He is being sued in his individual capacity.

18. Defendants HCSO John Does ("HCSO DOES") are employees of HCSO. Upon information and belief, HCSO Does were present during Christopher's arrest and/or were present and observed Cristopher while he was held in the Jail. At all times relevant herein, these HCSO Does were acting under color of state law and

were responsible for Christopher's health, safety, and security. Once Plaintiff determines the true identities of HCSO Does, Plaintiff will file appropriate motion(s) to substitute and/or request permission to amend this complaint. HCSO Does are being sued in their individual capacity.

19. Defendant Quality Correctional Health Care of Tennessee, PLLC., ("QCHC") is a for-profit professional limited liability company organized and existing under the laws of the State of Tennessee. QCHC is contracted by the County to provide medical services to all Jail inmates. Under Tennessee Corrections Institute ("TCI") Minimum Standard Rule 1400-01-.13(2), QCHC is the Jail's designated health authority.

20. Defendant Dr. Johnny E. Bates ("DR. BATES") was, at all times relevant herein, acting under color of state law, the sole owner of QCHC, a for-profit professional limited liability company, organized and existing under the laws of the State of Tennessee and contracted by the County to provide medical services to all Jail inmates. He is being sued in his official and individual capacities.

21. Defendant Nurse Marsh ("NURSE MARSH") was, at all times relevant herein, acting under color of state law, employed by QCHC as a medical provider at the Jail, and responsible for Christopher's health and safety. She is being sued in her individual capacity.

22. Defendants QCHC John Does ("QCHC DOES") are employed by QCHC as medical providers to the Jail. Upon information and belief, QCHC Does were present and observed Christopher while he was in HCSO custody. At all times

relevant herein, they were acting under color of state law and were responsible for Christopher's health and safety. Once Plaintiff determines the true identities of QCHC Does, Plaintiff will file appropriate motion(s) to substitute and/or request permission to amend this complaint. QCHC Does are being sued in their individual capacity.

## IV. FACTUAL ALLEGATIONS

### History of Constitutional Violations, including Medical Neglect, at the Hamilton County Jail

23. Prior to August of 2023, the Jail was known as Silverdale Detention Center. For nearly forty years, Silverdale was privately run by CoreCivic. In 2020, CoreCivic did not renew its contract with the County. In a letter to County Commissioners, CoreCivic accused the County of failing to address "significant safety and security issues," including "faulty locking controls, broken camera systems and interior and exterior doors that do not function properly."

24. The County and Garrett took control of Silverdale on January 1, 2021. The County Commission voted to change the name of the facility to the Hamilton County Jail in mid-2023.

25. For years, the Jail has been well known for its violence, inhumane conditions, medical neglect, and failure to protect inmates. These issues continue unabated despite the County's takeover of the facility.

26. In April 2021, inmate Christopher Bell was stabbed 17 times after jailers forced him and other new inmates into a cell where several inmates were waiting to attack them as part of an initiation of new detainees. See Jamie

Satterfield, *Trio of suits against Hamilton County Sheriff allege violent attacks in jail,* TENNESSEE LOOKOUT, April 21, 2022, retrieved February 10, 2025, at: https://tennesseelookout.com/2022/04/21/trio-of-suits-against-hamilton-county-sheriff-allege-violent-attacks-in-jail/

27. Christopher Bell's mother claims her son was still bleeding and had not received medical care more than twelve hours after the attacks. See: Michelle Heron, *7 Inmates Charged in Silverdale Detention Center Stabbing, HCSO Says*, WRCB-TV, December 1, 2021 retrieved February 10, 2025, at: https://www.local3news.com/localnews/whats-trending/update-7-inmates-charged-in-silverdale-detention-centerstabbings-hcso-says/article_641f7752-3fb7-5eeb-9187-3a2af3488bcc.html

28. In September of 2021, the Jail failed an inspection by the Tennessee Corrections Institute. Among the deficiencies found were overcrowded conditions, broken security cameras, and poor sanitation/maintenance. See: Eric Price, *Inspection finds 'deficiencies' at Silverdale Detention Center in Hamilton County,* WTVC-TV, February 3, 2022, retrieved February 10, 2025, at: https://newschannel9.com/news/local/inspection-finds-deficiencies-at-silverdale-detention-center-in-hamilton-county

29. In October 2021, inmate Brad Gifford was booked in the Jail for public intoxication. Within a few hours, he claims another inmate attacked him. Gifford suffered a concussion, black eyes, and his lip was torn from his jaw, leaving him with permanent facial nerve damage. Gifford says he repeatedly cried out for help

but was ignored. See: LaShawn Pagan, *Amid continuing inmate assaults, Hamilton County Sheriff seeks funding for more Silverdale officers*, CHATTANOOGA TIMES FREE PRESS, updated May 11, 2022, retrieved February 10, 2025 at: https://www.timesfreepress.com/news/2022/may/10/allegations-violence-continue-silverdale/

30. In April of 2022, while serving as the elected District Attorney General of Hamilton County, undersigned counsel asked the U.S. Department of Justice's Civil Rights Division to investigate conditions at the jail. This request came at the behest of a group of Chattanooga clergy troubled by overwhelming instances of violence and the failure of the County to take action to ensure inmates were treated humanely, protected from harm, and received timely and adequate medical care.

31. On April 5, 2022, Brandon Cornett was booked into the Jail. His wife claims she told Jail personnel on April 8, 2022, that Cornett was taking multiple medications to treat neuropathy. Mrs. Cornett says she was told the jail already had all her husband's medications. Two weeks later, Brandon Cornett was found unconscious in his cell with multiple oozing sores on his legs. He died the following day. Medical records show he was not seen by a doctor until the day prior to his death. LaShawn Pagan, *Two more lawsuits filed against Hamilton County involving Silverdale*, CHATTANOOGA TIMES FREE PRESS, March 24, 2023, retrieved on February 11, 2025, at: https://www.timesfreepress.com/news/2023/mar/24/two-more-lawsuits-filed-against-hamilton-county-silverdale-tfp/

32. In May of 2022, inmate Matthew Miller was booked in the Jail on an outstanding warrant. Miller claims that within ten minutes of being put in a housing cell, a group of inmates began beating him then dragged him into the showers where he was stabbed and raped. Miller suffered multiple cuts to the scalp and neck, stab wounds to the back, a broken nose, a torn knee, and a fractured femur. Despite the obvious injuries, Miller claims that once he was able to call for help the responding deputy showed no urgency in seeking medical treatment. Instead of immediately calling an ambulance, the deputy summoned a nurse who then called for an ambulance. (Id., ¶ 30)

33. On May 11, 2022, inmate Carol White was found dead in the Jail. White was five days into serving a 45-day sentence for drunk driving and was not provided her medications despite the court specifically instructing the Jail to do so in its sentencing order. See: LaShawn Pagan, *Chattanooga families claim deadly medical neglect at Silverdale Detention Center*, CHATTANOOGA TIMES FREE PRESS, last updated September 10, 2022, retrieved February 10, 2025 at: https://www.timesfreepress.com/news/2022/sep/10/families-claim-deadly-medical-neglect-tfp/

34. On May 16, 2022, inmate DaQuarrius Brown died at Erlanger Hospital. Brown required daily medications to treat HIV and asthma. Despite knowing about his condition, Jail personnel failed to provide Brown with any medication for more than two months. (Id., ¶ 34)

35. On June 12, 2022, inmate Donald Fitzgerald died in HCSO custody of a bleeding ulcer. Two days earlier, Fitzgerald had begun complaining to Jail staff of constant abdominal pain. Instead of seeking medical care, Jail personnel assumed Fitzgerald was experiencing drug withdrawal. They gave him laxatives and pain medication and used the metal detector at the Jail's entrance to conduct a "body scan." See: LsShawn Pagan, *Lawsuit claims Silverdale jail staff assumed inmate was constipated addict, let him die of bleeding ulcer*, CHATTANOOGA TIMES FREE PRESS, June 7, 2023, retrieved February 10, 2025, at: https://www.timesfreepress.com/news/2023/jun/07/lawsuit-silverdale-staff-assumed-inmate-tfp/

36. On July 23, 2022, it took guards almost four hours to notice four inmates had escaped. See: *Four inmates captured after escaping from Silverdale Detention Center*, CHATTANOOGA TIMES FREE PRESS, last updated, July 23, 2022, retrieved on February 10, 2025 at: https://www.timesfreepress.com/news/2022/jul/23/four-inmates-escape/.

37. On May 27, 2023, a brawl involving more than two dozen inmates erupted over a fentanyl dispute. One inmate was stabbed multiple times with a shank. Although thirty inmates were initially charged, all but one were let off the hook by prosecutors, who cited a lack of security video as the reason for dismissal. See: LaShawn Pagan, *No video evidence leads to dismissal of 30 assault cases at Silverdale*, CHATTANOOGA TIMES FREE PRESS, June 30, 2023, retrieved on

February 11, 2025, at: https://www.timesfreepress.com/news/2023/jun/30/no-video-evidence-leads-to-dismissal-of-30-tfp/

38. On June 28, 2023, a riot broke out during a contraband search at the Jail. While Garrett downplayed the incident as just "unruly inmates," HCSO called in multiple law enforcement agencies to help restore order. See: *Update: 'Unruly inmates' at Silverdale prompt multiple agencies to respond*, WRCB-TV, updated July 4, 2023, retrieved on February 11, 2025, at: https://www.local3news.com/local-news/update-unruly-inmates-at-silverdale-prompt-multiple-agencies-to-respond/article_77307134-15d0-11ee-9535-1f6e862fb180.html

39. In July of 2023, an attorney representing inmate Jason Chen publicly alleged Jail staff subjected his client to conditions "that amount to torture." Chen went without water for two days, was moved to a cell covered in feces, faced freezing temperatures, and was denied toiletries. Attorney Josh Weiss said he had to repeatedly alert Jail staff to problems to have them resolved. See: LaShawn Pagan, *Chattanooga attorney claims Jason Chen facing torture-like conditions at Silverdale Detention Center*, CHATTANOOGA TIMES FREE PRESS, July 4, 2023, retrieved on February 11, 2025, at:
https://www.timesfreepress.com/news/2023/jul/04/chattanooga-attorney-jason-chen-silverdale-jail-tfp/

40. On October 8, 2023, Jail staff transported Jebediah Srofe to Parkridge North Emergency Room following his arrest for driving under the influence and related charges. Upon hospital clearance he was returned to the Jail where he

continued to experience symptoms of drug withdrawal. Srofe was found unconscious on a shower floor on October 14, 2023. He died around an hour later at a hospital. A pending lawsuit filed by Srofe's parents allege their son died due to the Jail's failure to provide adequate medical care and deliberate indifference of the staff to ensure Srofe's safety and health. *Srofe v. Hamilton County, TN, et al.*, No. 1:24-cv-359 (E.D. Tenn. November 13, 2024), Complaint Docket No. 2.

41. On November 2, 2023, seven inmates had to be taken to emergency rooms due to suspected drug overdose. Two additional inmates were charged with possession of fentanyl for resale and possession of contraband. It is unknown how the suspects got the drugs into the Jail. See: *Two charged after seven Hamilton County inmates show signs of overdose*, CHATTANOOGA TIMES FREE PRESS, November 3, 2023, retrieved on February 11, 2025, at: https://www.timesfreepress.com/news/2023/nov/03/two-charged-after-seven-hamilton-county-inmates/

42. On March 14, 2024, inmate Deward Johnson died while waiting to be released from the Jail. An autopsy showed Johnson died of a drug overdose. He had meth, fentanyl, and amphetamines in his system. Other inmates had seen him vomiting but Jail staff did not provide him with medical care. See: Ellen Gerst, *Autopsy: Man's death before release at Hamilton County Jail likely caused by drugs*, CHATTANOOGA TIMES FREE PRESS, May 3, 2024, retrieved on February 11, 2025 at: https://www.timesfreepress.com/news/2024/may/03/autopsy-mans-death-before-release-at-hamilton/

43. Since Garrett assumed control of the Jail from CoreCivic, the number of in-custody deaths is 2.2 times higher than the national average. University of Tennessee at Knoxville Criminologist Michelle Brown said the numbers are "really very high" and "It should be shocking." In contrast, Garrett's spokesman, Matt Lea, claimed, "We have a very safe jail." Lea also claimed statistics compiled by the U.S. Department of Justice are not accurate, telling the media, "It's very complicated. I'm not a mathematician." See: Sofia Saric, *'It should be shocking': Hamilton County jail death rate far exceeds national figure,* CHATTANOOGA TIMES FREE PRESS. October 27, 2024, retrieved on February 11, 2025, at: https://www.timesfreepress.com/news/2024/oct/27/it-should-be-shocking-hamilton-county-jail-death/

44. Garrett has found one way to manipulate those statistics. He has established a pattern and practice of seeking dismissal of cases against inmates who suffer life-threatening injuries or end up hospitalized due to medical neglect. He and his spokesman frequently claim such an inmate has been released from custody "due to the severity of the injuries." This absolves HCSO of the costs associated with hospital bills for critical medical care and the costs of around-the-clock bedside guards. If a "released" hospitalized inmate dies as a direct or proximate result of incarceration – either through violence or medical neglect – that death would not need to be reported to the U.S. Attorney General under the Death in Custody Reporting Act.

45. Defendants have taken no substantial steps to remedy unconstitutional conditions at the Jail, thereby depriving inmates of civil rights afforded under the U.S. Constitution.

46. Instead of improving jail conditions, three months prior to Christopher's detention Garrett devoted significant time to addressing problems twelve hundred miles away at the U.S. Southern border. In addition to touring Eagle Pass, Texas, as part of a group led by U.S. Senator Bill Hagerty, Garrett travelled to Nashville to participate in a press conference about the trip. He and Hagerty also hosted a "public" event at the private Walden Club to "help our community understand" … the "unmitigated disaster we are seeing unfold at the border…" See: HCSO Press Release, *Message from Sheriff Austin Garrett on U.S. Southern Border Visit*, February 22, 2024, retrieved on February 11, 2025 at: https://www.hcsheriff.gov/pressreleases/display.php?releaseid=1699

47. Meanwhile, Garrett has done nothing to help our community understand why the Jail's death rate is twice the national average or what Garrett intends to do about it.

48. Pervasive civil rights violations have prompted numerous lawsuits against the County, the Jail, Garrett, and former Sheriff Jim Hammond. Currently, Senior U.S. District Judge Curtis Collier is overseeing around a dozen cases involving violence, medical neglect, and/or other civil rights violations that occurred at the Jail.

49. Attorneys with the Chattanooga Office of Federal Defender Services of East Tennessee routinely, as a matter of pattern and practice, request their clients not be held at the Hamilton County Jail.

**Plaintiff's False Arrest, Neglect, and Denial of Medical Care**

50. On April 27, 2024, Hamilton County 911 received four emergency calls from Christopher Ayala. Dispatchers said Christopher was "not making sense" and sent a deputy to check on him at 8607 Ramsey Acres Road.

51. An arrest report dated April 27, 2024, and a timeline provided by HCSO show Deputy Widdows responded to Christopher's calls at 5:43pm. Widdows wrote that Christopher "appeared to be under the influence of narcotics" and could smell "a strong odor of marijuana."

52. Widdows said Christoper told him there was no emergency, that Widdows told Christopher not to call 911 unless he had an actual emergency, and that Widdows then left the property.

53. Around thirty minutes later, 911 received multiple text messages from Christopher's cell phone.

54. Widdows was again dispatched to 8607 Ramsey Acres Road at 6:51pm. Widdows said Christopher's parents indicated Christopher struggled with ongoing drug use. In the arrest report, Widdows wrote, "He still appeared to be under the influence of narcotics and was holding a phone in his hand. Deputies did not observe any injuries or any emergency going on with him. . ."

55. Christopher's behavior was inconsistent with typical narcotics use. The term "narcotic" is derived from the Greek word for "stupor." Narcotics are opioids with numbing and paralyzing properties, used to treat moderate to severe pain. In addition to reducing pain, narcotics cause a sense of intense happiness and well-being.

56. Christopher's behavior was symptomatic of opioid overdose. Poor judgment, inability to control behavior, confusion, and delusional and/or paranoid behaviors are key indicators of drug toxicity and/or overdose.

57. Opioid overdose is an objectively serious medical emergency. Without immediate and appropriate medical intervention, the brain becomes deprived of oxygen as breathing slows. This leads to brain damage or even death.

58. Instead of calling for an ambulance, Widdows arrested Christopher for improper use of 911, a Class A misdemeanor, and transported him to the Jail for booking.

59. Upon arrival at the Jail at 7:33pm, Widdows secured Christopher's right hand to a bench with handcuffs.

60. Around thirty minutes later, at 8:00pm, Christopher was moved to a holding cell. Jail records show he was "unstable on his feet."

61. At 8:16pm, Christopher again appeared unsteady as he walked to a water cooler for water.

62. Upon observing Christopher's "strange behavior," Deputies Pitre and Sandoval tried to move Christopher back to an intake bench. Christopher fell to the

ground. Instead of calling for medical help, deputies decided Christopher was being "resistant."

63. Deputies Pitre and Thurman put hand restraints on Christopher, moved him from the floor to a bench, and then secured him to the bench. He was then reportedly "checked by medical" around 8:20pm.

64. The next entry on the HCSO timeline is more than an hour and a half later, at 9:53pm, when Christopher showed signs of distress. He told deputies he was dying and could not see. He then began seizing and fell over onto the bench.

65. Deputies Thurman, Sandoval, and Pitre removed Christopher's handcuffs and place him on his side. Nurse Marsh checked his pupils and blood sugar. Sgt. Poteet decided Christopher was "faking the seizure." It is unknown what medical training, if any, Sgt. Poteet has undergone to distinguish between real and faked seizure activity.

66. At 10:09pm, Sgt. Poteet and Deputies Pitre and Thurman placed Christopher in a restraint chair "to prevent self-harm."

67. One minute later, the timeline shows "Medical checked on Ayala."

68. At 10:16pm, Christopher was observed motionless in the restraint chair. He was not reacting to his surroundings.

69. At 10:20pm, Captain Stolz asked Christopher if he was okay. Christopher did not respond.

70. Nurse Marsh then checked Christopher's eyes for reaction to light. He did not respond.

71. At 10:27pm, Christopher was observed staring at the ceiling with his right leg bouncing.

72. At 10:30pm, Christopher was left alone in the booking area.

73. When Nurse Marsh came to check his blood pressure at 10:53pm, Christopher again appeared to be actively seizing.

74. Nurse Marsh called Sgt. Perry and requested EMS. At 10:56pm, Christopher's breathing was shallow and labored.

75. By 10:59pm, Christopher was no longer breathing.

76. At 11:02pm, Nurse Marsh alerted others that Christopher was unresponsive. Deputies Pitre and Terry removed him from the restraint chair. Nurse Marsh began CPR, administered Narcan, and placed a pulse reader on Christopher's finger.

77. EMS arrived on scene at 11:15pm. and transported Christopher to Erlanger Hospital.

78. Upon his arrival at Erlanger Hospital, medical staff observed Christopher to be comatose.

79. No one associated with the Jail contacted Ms. Santos to let her know her son was injured.

80. Instead, Ms. Santos was contacted by staff at Erlanger Hospital.

81. When she arrived at Erlanger, doctors told Ms. Santos that Christopher had no oxygen flowing to the brain, was "close to brain dead" and

prepared her for the likelihood Christopher would not survive, and a decision would need to be made about potential organ harvesting.

82. When allowed to see Christopher, Ms. Santos observed several injuries, including a busted lip and a chipped tooth, as well as scratching and bruising over his body.

83. At 8:30am the following day, April 28, 2024, HCSO released Christopher from custody. Jail staff then took Christopher's personal property to Erlanger.

84. Less than 24 hours later, Hamilton County District Attorney General Coty Wamp dismissed the charge against Christopher without explanation. When asked about the dismissal, Wamp told the media, "How can one ... not think the reason for dismissal is fairly obvious?" See: WBMA-TV, *Deputies arrested a Chattanooga man for misusing 911. 48 hours later, he was brain dead*, updated May 15, 2024, retrieved on February 10, 2025 at: http://bit.ly/3WXLjB0

85. Despite long odds, Christopher did reawaken. He was transferred to Shepherd Center in Atlanta for extensive brain injury rehabilitative care.

86. Christopher suffers from irreversible brain damage which largely limits his ability to process complex information. This required Ms. Santos to become Christopher's power of attorney.

87. Christopher is taking part in ongoing physical therapy to improve his mobility and fine motor skills.

88. However, he will never be able to live independently or financially support himself.

**COUNT ONE**
**42 U.S.C. § 1983 DELIBERATE INDIFFERENCE TO CHRISTOPHER AYALA'S MEDICAL NEEDS**
**(AGAINST ALL DEFENDANTS)**

89. Plaintiff re-alleges and incorporates by reference all proceeding paragraphs as if fully set forth herein.

90. Defendants Poteet, Perry, Stolz, Widdows, Pietre, Sandoval, Thurman, Terry, HCSO Does, QCHC Does, and Nurse Marsh had all personally interacted with Christopher and observed his deteriorating medical condition or knew or should have known of his deteriorating medical condition. As such, they were aware or should have been aware that Christopher suffered from an objectively serious medical emergency. These Defendants actions or lack of thereof were either intentional in ignoring this life-threatening situation, or reckless in that they failed to act appropriately and reasonably to mitigate the risks of Christopher's objectively serious medical emergency. As such, these Defendants were deliberately indifferent to Christopher's serious and urgent medical need.

91. Alternatively, the above Defendants recognized Christopher had an objectively serious and urgent medical need and knew or should have known from the facts available to them that Christopher was experiencing a life-threatening medical emergency but disregarded the substantial risk posed by failing to take reasonable actions. As such, these Defendants were deliberately indifferent to Christopher's serious medical emergency.

92. The signs of medical distress, such as collapsing on the floor, actively seizing, and being non-responsive are, individually, enough to make a reasonable person take immediate action. The average person, watching a family member collapse, or experience a seizure, or become non-responsive would call 911 for an ambulance. That Christopher exhibited all three of these objectively serious medical emergencies while those responsible for his health and safety did not immediately seek appropriate medical care, would shock the conscious of a reasonable person.

93. Defendants Hamilton County, Garrett, Shepherd, Hargis, Knight, QCHC, and Dr. Bates had long been aware that Jail conditions were, and continue to be, well below a constitutional level. Christopher's experience was not an isolated incident. Considering the sheer numbers of overdoses among inmates and instances of medical neglect, these Defendants knew or should have known the Jail fails to provide appropriate care in instances of objectively serious medical needs such as to cause preventable permanent injuries and/or deaths. By failing to take substantial steps to remedy these failings, Defendants have shown they were deliberately indifferent to Christopher's objectively serious and urgent medical need

94. The average person, after simply reading the plethora of media reports detailing overdose after overdose and story after story of medical neglect would know the Jail failed to provide an environment that protected Christopher's constitutional rights. That these Defendants have done little to remedy such blatant constitutional violations would shock the conscious of any reasonable person.

95. The actions and/or inaction of all Defendants solely and/or in combination violated Christopher's rights under the Fourteenth (and/or alternatively the Eighth) Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983, in that they demonstrate the Defendants were deliberately indifferent to Christopher's serious medical needs.

96. Consequently, Plaintiff is entitled to all permissible damages, including punitive damages substantial enough to deter future Fourteenth Amendment violations.

**COUNT TWO**
**42 U.S.C. § 1983 (MONELL LIABIITY)**
**THE COUNTY AND QCHC HAVE A DEFACTO POLICY, PATTERN, OR PRACTICE OF FAILING TO PROVIDE APPROPRIATE MEDICAL CARE**
**(AGAINST THE COUNTY, SHERIFF GARRETT, AND QCHC)**

97. Plaintiff re-alleges and incorporates by reference all proceeding paragraphs as if fully set forth herein.

98. QCHC, as the designated medical health authority, establishes and maintains the policies, practices, customs, and usages for the provision of health and medical care to inmates and detainees at the Jail. This includes objectively serious emergency medical needs such as Christopher's.

99. QCHC has demonstrated a longstanding pattern of apathy and failure to appropriately respond to known objectively serious medical emergencies such as Christopher's. No significant steps have been taken to alter this pattern, as is evidenced by the continuing instances of medical neglect, some of which have led to

preventable deaths. Therefore, this Defendant has demonstrated deliberate indifference to Christopher's objectively serious and urgent medical need.

100. In his official capacity, Sheriff Garrett has a constitutional duty to safeguard all inmates and detainees in the Jail. Therefore, he has an obligation to know of the deplorable deficiencies in medical care and to remedy the problems. His failure to do so, even after Christopher's incident, evidences a policy or custom of deliberate indifference.

101. Contracting out jail medical care does not relieve the county of its constitutional duty to provide adequate medical treatment to those in its custody. *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1250 (6th Cir. 1989).

102. Additionally, the county has a duty to properly fund its Emergency Medical Services to ensure inmates and detainees have access to appropriate urgent and emergency medical care. Once the Jail notified 911 of Christopher's life-threatening need for medical care, it took EMS seventeen minutes to respond. This is significantly higher than EMS's average response time of ten minutes and nearly double the national average response time of eight minutes. The County knew its average EMS response time was higher than average and took no action to ensure appropriate emergency medical care would be available to the Jail. Since Christopher's incident, no significant changes have been made to improve response times. Failure to make changes, even after Christopher's incident, evidences a policy or custom of deliberate indifference.

103. Hamilton County, Sheriff Garrett, and QCHC were directly responsible for the deprivation of Christopher's constitutional rights as described herein and are therefore subject to liability under 42 U.S.C. § 1983, *Monell v. Dep't of Social Servs of New York,* 436 U.S., 658, 691 (1978).

**COUNT THREE**
**42 U.S.C. § 1983 (CANTON LIABILITY)**
**SUPERVISORY LIABILITY FOR FAILURE TO TRAIN**
**(AGAINST THE COUNTY, GARRETT, SHEPHERD, HARGIS, KNIGHT, QCHC, AND DR. BATES)**

104. Plaintiff re-alleges and incorporates by reference all proceeding paragraphs as if fully set forth herein.

105. The U.S. Centers for Disease Control and Prevention have classified opioid use as a national epidemic. In 2022, Tennessee's overdose death rate was surpassed by only West Virginia and the District of Columbia. In 2023, Hamilton County averaged four overdose deaths per week. Illicit drug use has been a major driver behind the Jail's historic issues with overcrowding. The County established a Drug Court in part to deal with the high number of defendants facing drug charges.

106. Law enforcement, corrections officers, and corrections medical personnel routinely and more than daily deal with individuals who present with symptoms of drug use, drug overdose, and drug withdrawal. The training, or lack thereof, of these professionals is often the difference between life and death for drug users experiencing an objectively serious medical emergency.

107. QCHC and Dr. Bates were responsible for employing, training and supervising personnel who would and could appropriately diagnose and treat

inmates and detainees at the Jail who suffered from opioid overdose such as Christopher. In this regard these Defendants were deliberately indifferent to Christopher's constitutional rights.

108. Hamilton County and Sheriff Garrett failed to properly train and/or supervise the individual officers to recognize and distinguish between drug use and drug toxicity. These Defendants also failed to properly train and/or supervise the individual officers to ensure their actions met a constitutional standard of care for objectively serious medical emergencies such as Christopher's. In this regard, these defendants were deliberately indifferent to Christopher's constitutional rights.

109. Hamilton County, Sheriff Garrett, QCHC, and Dr. Bates were directly responsible for the deprivation of Christopher's constitutional rights as described herein and are therefore subject to liability under 42 U.S.C. § 1983, *City of Canton, Ohio, v. Harris*, 489 U.S. 378 (1989.)

**COUNT FOUR**
**COMMON LAW NEGLIGENCE**
**(AGAINST ALL DEFENDANTS)**

110. Plaintiff re-alleges and incorporates by reference all proceeding paragraphs as if fully set forth herein.

111. Plaintiff avers the four prong requirements of Tennessee common law negligence are met in this case.

112. Defendants had a legal duty to provide Christoper, a pre-trial detainee, with appropriate medical care and to ensure his safety while in HCSO custody.

113. Defendants breached that duty by failing to protect Christopher from reasonably foreseeable harm.

114. Defendants Hamilton County, Garrett, Shepherd, Hargis, Knight, QCHC, and Dr. Bates had long known Jail conditions, including medical care, were and remain well below a constitutional level. These Defendants have been on notice for years and have done nothing substantial to bring the Jail into compliance with state and federal law.

115. Defendants Poteet, Perry, Stolz, Widdows, Pietre, Sandoval, Thurman, Terry, HCSO Does, QCHC Does, and Nurse Marsh all personally interacted with Christopher on the evening of April 27, 2024, as he displayed a series of increasingly worrisome emergency medical symptom and did not take sufficient action. Defendants knew or should have known Christopher required immediate medical attention that could not be provided at the Jail. They knew or should have known that failing to call an ambulance in a timely manner would result in significant injuries, up to and including death.

116. The above failures of all Defendants are the direct and proximate cause of Christopher's injuries. As a result of those failures, Christopher will never have a career, will never even be able to support himself, and will never live independently.

117. His injuries have required extensive and currently ongoing medical care and rehabilitative therapy.

**COUNT FIVE**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**


Case 1:25-cv-00056-CHS Document 1 Filed 02/19/25 Page 29 of 31 PageID #: 29

**UNDER TENNESSEE LAW**
**(AGAINST ALL DEFENDANTS)**

118. Plaintiff re-alleges and incorporates by reference all proceeding paragraphs as if fully set forth herein.

119. All Defendants are liable to Christopher for injuries and damages resulting from the intentional infliction of emotional distress he experienced and continues to experience due to the actions and inactions of all Defendants.

## COUNT FIVE
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
## UNDER TENNESSEE LAW
## (AGAINST ALL DEFENDANTS)

120. Plaintiff re-alleges and incorporates by reference all proceeding paragraphs as if fully set forth herein.

121. All Defendants are liable to Christopher for injuries and damages resulting from the negligent infliction of emotional distress he experienced and continues to experience due to the actions and inactions of all Defendants.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully prays for relief as follows:

A. That proper process issue and be served upon Defendants;

B. That Defendants be required to appear and answer this Complaint within the time required by law;

C. That a jury be empaneled to try this case on all issues so triable;

D. That Plaintiff be awarded compensatory damages plus interest, including pre-judgment interest, in an amount to be determined at trial;

E. That Plaintiff be awarded punitive damages plus interest, including pre-judgment interest, in an amount great enough to deter Defendants from future constitutional rights violations;

F. That Plaintiff be awarded all costs and discretionary costs of trying this action;

G. That Plaintiff be awarded reasonable attorney fees pursuant to 42 U.S.C. § 1988;

H. That this Honorable Court declare Defendants acted illegally by failing to assure constitutionally required levels of inmate medical care;

I. That under 18 U.S.C. § 3626, the Court appoint a Special Master to conduct hearings, and propose findings on the record, and if the Court deems necessary, to assist in the development of remedial plans to bring the Jail in line with constitutional requirements;

J. That such other and further relief be granted as this Honorable Court deems equitable, proper, and just.

Dated this the 19th day of February 2025.

/s/ Neal Pinkston
__________________________

Neal Pinkston
Pinkston Law, PLLC
1216 East Main Street
Suite 206
Chattanooga, TN 37408
(423) 497-7228
Fax: (423) 501-3971
neal@nealpinkstonlaw.com
*Counsel for Plaintiff*